# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

In Re VEECO INSTRUMENTS, INC.,  :   05-MD-1695 (CM)
SECURITIES LITIGATION  :

———————————————————— x

THIS DOCUMENT RELATES TO:  :

———————————————————— x

EDWARD J. HUNEKE, derivatively on behalf of :   05-CV-10224 (CM)
VEECO INSTRUMENTS, INC.,  :
  :
          Plaintiff(s),  :
  :
    vs.  :
  :
EDWARD H. BRAUN, et al.,  :
  :
         Defendant(s),  :

———————————————————— x

AUGUST SCHUPP, III, derivatively on behalf of :   05-CV-10225 (CM)
VEECO INSTRUMENTS, INC.,  :
  :
          Plaintiff(s),  :
  :
    vs.  :
  :
EDWARD H. BRAUN, et al.,  :
  :
         Defendant(s),  :

———————————————————— x

DAVID ALTMAN, derivatively on behalf of :   05-CV-10226 (CM)
VEECO INSTRUMENTS, INC.,  :
  :
          Plaintiff(s),  :
  :
    vs.  :
  :
EDWARD H. BRAUN, et al.,  :
  :
         Defendant(s).  :

———————————————————— x

## PLAINTIFFS' MEMORANDUM OF LAW
## IN SUPPORT OF PROPOSED SETTLEMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................ ii

I.      INTRODUCTION ...................................................................1

II.     FACTUAL AND PROCEDURAL BACKGROUND............................................3

III.    TERMS AND BENEFITS OF THE SETTLEMENT ...........................................8

IV.     THE STANDARDS FOR JUDICIAL APPROVAL
        OF DERIVATIVE SETTLEMENTS ......................................................9

        A.    The Role Of The Court In Approval Of A Settlement ...............................9

        B.    The Settlement Is Fair, Reasonable And Adequate ..................................11

        C.    Factors Supporting Approval Of The Settlement .....................................12

              1.    Risks of Establishing Liability .......................................................13

                    a.    Plaintiffs' Proposed Claims Based
                          on Stock Option Backdating ...............................................13

                    b.    Plaintiffs' Upheld Claims in the Action ............................15

              2.    Risks in Establishing Damages ....................................................17

              3.    Complexity, Expense, Risk,
                    and Duration of Further Litigation .................................19

              4.    The Reaction of Current Veeco Stockholders
                    also Supports a Finding that the
                    Settlement Should Be Approved....................................20

              5.    Opinion of Plaintiffs' Counsel .....................................21

V.      CONCLUSION ...................................................................23

# TABLE OF AUTHORITIES

**Cases**                                                        **Page**

*Aronson v. Lewis*,
473 A.2d 805 (Del. 1984) ...........................................................................13, 15

*Backman v. Polaroid Corp.*,
910 F.2d 10 (1st Cir. 1990) ...................................................................20

*Barkan v. Amsted Indus., Inc.*,
567 A.2d 1279 (Del. 1989) ...................................................................11

*Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*,
845 A.2d 1040 (Del. 2004) ...................................................................13

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
603 F.2d 263 (2d Cir. 1979) ...................................................................20

*Bonime v. Doyle*,
416 F. Supp. 1372 (S.D.N.Y. 1976), *aff'd*,
556 F.2d 554 (2d Cir. 1977), *cert. denied sub nom.*,
*Sloan v. Bonime*, 434 U.S. 924 (1977) .................................................................11

*Boyd v. Bechtel Corp.*,
485 F. Supp. 610 (N.D. Cal. 1979) ......................................................................22

*Chiulli v. Hardwicke Cos.*,
1985 WL 11532 (Del. Ch. Feb. 11, 1985) ...........................................................21

*Citron v. Burns*,
No. 7647, 1985 WL 11533 (Del. Ch. Feb. 4, 1985) ............................................12

*City of Detroit v. Grinnell Corp.*,
356 F. Supp. 1380 (S.D.N.Y. 1972),
*aff'd in part & rev'd in part on other grounds*,
495 F.2d 448 (2d Cir. 1974) ...........................................................................10, 11

*City of Detroit v. Grinnell Corp.*,
495 F.2d 448 (2d Cir. 1974) ...............................................................................11

*Cohn v. Nelson*,
375 F. Supp. 2d 844 (E.D. Mo. 2005) .................................................................12

*Desimone v. Barrows*,
924 A.2d 908 (Del. Ch. 2007) ...........................................................................14

*Gambale v. Deutsche Bank AG,*
    377 F.3d 133 (2d Cir. 2004)...............................................................11

*Greenspun v. Bogan*,
    492 F.2d 375 (1st Cir. 1974) ............................................................21

*Grunin v. Int'l House of Pancakes*,
    513 F.2d 114 (8th Cir. 1975) ...........................................................21

*In re Caremark Int'l, Inc. Deriv. Litig.*,
    698 A.2d 959 (Del. Ch. 1996) ..........................................................12

*In re Computer Sciences Corp. Deriv. Litig.*,
    2007 WL 1321715 (C.D. Cal. Mar. 26, 2007) ......................................14

*In re Comverse Tech., Inc. Deriv. Litig.*,
    No. 601272/06, Slip op. (N.Y. Sup. Ct. Aug. 14, 2007) ........................14

*In re CNET Networks, Inc. S'holder Deriv. Litig.*,
    483 F. Supp. 2d 947 (N.D. Cal. 2007) ...............................................14

*In re F5 Networks, Inc.*,
    2007 WL 2476278 (W.D. Wash. Aug. 6, 2007); ...................................14

*In re Finisar Corp. Deriv. Litig.*,
    2008 WL 131867 (N.D. Cal. Jan. 11, 2008) ........................................14

*In re Infosonics Corp. Deriv. Litig.*,
    2007 WL 2572276 (S.D. Cal. Sept. 4, 2007) .......................................14

*In re J.P. Stevens & Co. S'holders Litig.*,
    542 A.2d 770 (Del. Ch. 1988) ..........................................................16

*In re Linear Tech. Corp. Deriv. Litig.*,
    2006 WL 3533024 (N.D. Cal. Dec. 7, 2006); .......................................14

*In re Lloyd's Am. Trust Fund Litig.*,
    No. 96 Civ. 1262 (RWS),
    2002 WL 31663577 (S.D.N.Y. Nov. 26, 2002) ....................................18

*In re Metropolitan Life Deriv. Litig.*,
    935 F. Supp. 286 (S.D.N.Y. 1996) ....................................................10

*In re MIPS Tech., Inc. Deriv. Litig.*,
    2008 WL 131915 (N.D. Cal. Jan. 11, 2008) ........................................14

*In re Openwave Sys. Inc. S'holder Deriv. Litig.*,
    2007 WL 1456039 (N.D. Cal. May 17, 2007) ......................................................14

*In re Nat'l Student Mktg. Litig.*,
    68 F.R.D. 151 (D.D.C. 1974) .................................................................................22

*In re PaineWebber Ltd. P'ships Litig.*,
    171 F.R.D. 104 (S.D.N.Y. 1997),
    *aff'd*, 117 F.3d 721 (2d Cir. 1997) ........................................................................18

*In re PMC-Sierra, Inc. Deriv. Litig.*,
    2007 WL 2427980 (N.D. Cal. Aug. 22, 2007) ......................................................14

*In re SmithKline Beckman Corp. Sec. Litig.*,
    751 F. Supp. 525 (E.D. Pa. 1990) .........................................................................21

*In re Texaco, Inc. S'holder Litig.*,
    20 F. Supp. 2d 577 (S.D.N.Y. 1998),
    *rev'd on other grounds sub nom.*,
    *Kaplan v. Rand*, 192 F.3d 60 (2d Cir. 1999) .......................................................12

*In re Verisign, Inc. Deriv. Litig.*,
    531 F. Supp. 2d 1173 (N.D. Cal. 2007) ................................................................14

*In re Vitalink Commc'n S'holders Litig.*,
    Civ. A. No. 12085, 1991 WL 238816
    (Del. Ch. Nov. 8, 1991)..........................................................................................11

*In re Walt Disney Co. Deriv. Litig.*,
    907 A.2d 693 (Del. Ch. 2005),
    *aff'd*, 906 A.2d 27 (Del. 2006) .............................................................................15

*In re Warner Commc'ns Sec. Litig.*,
    618 F. Supp. 735 (S.D.N.Y. 1985),
    *aff'd*, 798 F.2d 35 (2d Cir. 1986) .........................................................................20

*Kahn v. Sullivan*,
    594 A.2d 48 (Del. 1991) ......................................................................................10

*Kamen v. Kemper Fin. Serv. , Inc.*,
    500 U.S. 90 (1991) .......................................................................................10, 14

*Krinsky v. Helfand*,
    156 A.2d 90 (Del. 1959) ......................................................................................10

*Levine v. Smith*,
    591 A.2d 194 (Del. 1991) ...................................................................13

*Lewis v. Newman*,
    59 F.R.D. 525 (S.D.N.Y. 1973) ..........................................................13

*Maher v. Zapata Corp.*,
    714 F.2d 436 (5th Cir. 1983) ...............................................................19

*Miller v. Republic Nat'l Life Ins. Co.*,
    559 F.2d 426 (5th Cir. 1977) ...............................................................21

*Nelson v. Bennett*,
    662 F. Supp. 1324 (E.D. Cal. 1987) ....................................................13

*Officers for Justice v. Civil Serv. Commc'ns*,
    688 F.2d 615 (9th Cir. 1982) ...............................................................10

*Packard v. Provident Nat'l Bank*,
    994 F.2d 1039 (3d Cir. 1993) ..............................................................20

*Polk v. Good*,
    507 A.2d 531 (Del. 1986) ............................................................. 12-13

*Prezant v. DeAngelis*,
    636 A.2d 915 (Del. 1994) ....................................................................10

*Prod. Res. Group, L.L.C. v. NCT Group, Inc.*,
    863 A.2d 772 (Del. Ch. 2004) .............................................................17

*Risberg v. McArdle*,
    529 F. Supp. 2d 213 (D. Mass. 2008) ...........................................14, 15

*Rome v. Archer*,
    197 A.2d 49 (Del. 1964) ......................................................................21

*Schleiff v. Chesapeake & Ohio Ry. Co.*,
    43 F.R.D. 175 (S.D.N.Y. 1967) ..........................................................22

*Stoetzner v. U.S. Steel Corp.*,
    897 F.2d 115 (3d Cir. 1990) ................................................................21

*Sugarland Indus., Inc. v. Thomas*,
    420 A.2d 142 (Del. 1980) ....................................................................11

*Trans World Airlines, Inc. v. Hughes*,
     312 F. Supp. 478 (S.D.N.Y. 1970),
     *modified*, 449 F.2d 51 (2d Cir. 1971),
     *rev'd*, 409 U.S. 363 (1973) ................................................................................20

*Wandel v. Eisenberg*,
     No. 603665/06, Slip op. (N.Y. Sup. Ct. May 2, 2007) ..........................................14

*Weiss v. Mercedes-Benz of N.A., Inc.*, ,
     899 F. Supp. 1297 (D.N.J. 1995),
     *aff'd*, 66 F.3d 314 (3d Cir. 1995) ........................................................................19

*White v. Panic*,
     783 A.2d 543 (Del. 2001) .................................................................................16

*Williams v. First Nat'l Bank*,
     216 U.S. 582 (1910) .........................................................................................11

## Statutes & Regulations

8 Del. C. § 102(b)(7) ................................................................................................17

Federal Rule of Civil Procedure 23.1 ................................................................................9

## I.    INTRODUCTION

Plaintiffs August Schupp III and David Altman respectfully submit this memorandum of law in support of their application for approval of the proposed settlement (the "Settlement") of the above-captioned consolidated shareholder derivative action (the "Action"), contained in the Stipulation and Agreement of Settlement.[1]

Plaintiffs are pleased to present the Settlement to the Court for final approval. The Settlement was the culmination of over two and a half years' worth of litigation and arm's-length negotiations among experienced and esteemed counsel who comprehensively understood and debated the merits of the Action. Plaintiffs believe that the Settlement is a "fair and adequate" result for Veeco Instruments, Inc. ("Veeco" or the "Company"), particularly in light of the significant challenges plaintiffs faced with the continued prosecution of the Action.

In sum, the Settlement provides that in connection with the filing, prosecution, and settlement of the Action, Veeco's Board of Directors (the "Board") has agreed to adopt the significant corporate governance policies set forth in detail below. The Stipulation also provides for an award of counsel fees and expenses to plaintiffs' counsel for the successful resolution of the Action.[2]

Plaintiffs' counsel advised plaintiffs to enter into the Stipulation only after approximately thirty-three (33) months of litigation and research, to determine the strengths and weaknesses of plaintiffs' claims, all of which supported the fairness of the Settlement. Plaintiffs' counsel have conducted an extensive investigation during the development and prosecution of the Action. This investigation has included, *inter alia*: (i) inspecting, reviewing and analyzing the

---

[1]    This brief incorporates by reference the entirety of the parties' Stipulation of Settlement dated December 19, 2007 (the "Stipulation"). Unless otherwise herein defined, all capitalized terms used herein shall have the same meanings as set forth in the Stipulation.

[2]    The Fee Award provided for in the Stipulation is addressed separately by plaintiffs in their Memorandum of Law in Support of Application for An Award of Attorneys' Fees and Reimbursement of Expenses, submitted concurrently with the instant brief.

Company's financial filings and tens of thousands of its internal documents; (ii) deposing numerous witnesses; (iii) retaining several experts to assess liability and damages; (iv) researching corporate governance issues; (v) participating in numerous in-person and telephonic meetings with defendants' counsel; and (vi) researching the applicable law with respect to the claims alleged in the Action and the potential defenses thereto.

On January 24, 2008, the Court entered an Order Preliminarily Approving Derivative Action Settlement (the "Preliminary Order") directing that a final settlement hearing be held on March 28, 2008 (the "Settlement Hearing") to determine the fairness, reasonableness, and adequacy of the Settlement and the Fee Award. Pursuant to the terms of the Preliminary Order, on January 31, 2008: (i) the Notice of the Settlement and Fee Award was published by Veeco as a current report on SEC Form 8-K; and (ii) Veeco provided a link on its corporate website to the Notice.[3]    The Notice contained detailed descriptions of the history of the Action and the Settlement, the claims that will be released if the proposed Settlement is approved, and the Fee Award sought by plaintiffs' counsel. The Notice further disclosed the date, time, and place of the Settlement Hearing and advised current Veeco stockholders of the procedures for objecting to the proposed Settlement and/or Fee Award. To date, and despite the fact that Veeco has thousands of stockholders, plaintiffs' counsel are unaware of any objections to the proposed Settlement, which is very strong evidence that it is fair, reasonable, and adequate.[4]

As demonstrated below, the efforts of plaintiffs and their counsel in connection with the filing, prosecution, and settlement of the Action caused Veeco to adopt the valuable corporate governance policies set forth in detail below, that are directly related and responsive to the

---

[3]    An Affidavit of Compliance will or has been filed by defendants.

[4]    Plaintiffs' counsel are also unaware of any objections to the proposed Fee Award, which likewise is very strong evidence that the Fee Award is fair, reasonable, and adequate.

contentions made in the Action. These material benefits fully justify this Court's approval of the Settlement as fair and reasonable, and it should finally approve it.[5]

## II.    FACTUAL AND PROCEDURAL BACKGROUND

Veeco is a Delaware corporation which maintains its headquarters at 100 Sunnyside Boulevard, Woodbury, New York. *See* Declaration of Robert I. Harwood ("Harwood Dec.") at ¶ 3.[6] According to its public filings, the Company designs, manufactures, markets and services a line of equipment primarily used by manufacturers in the data storage, semiconductor, compound semiconductor/wireless and high-brightness light emitting diode industries. *Id.* at ¶ 4.

On November 3, 2003, Veeco announced that it purchased the TurboDisc division from Emcore Corporation. *Id.* at ¶ 5. Veeco praised the deal as a "key acquisition" that would purportedly allow it to significantly broaden its product and technical offerings to its key customers. *Id.* TurboDisc undeniably represented a substantial acquisition for Veeco, as it added 120 new employees to its then-workforce of approximately 1,100, as well as assets necessary to the engineering, design and manufacturing of its products, including a physical plant in New Jersey. *Id.*

After the acquisition, TurboDisc became one of Veeco's largest and most important divisions. *Id.* at ¶ 6. Throughout the Relevant Period,[7] TurboDisc had a substantial and material impact on Veeco's financial results, allowing Veeco to report quarter after quarter of positive results aided, purportedly, by TurboDisc's strong business. *Id.* The positive results caused a substantial increase in Veeco's stock price. *Id.*

---

[5]    These material benefits to the Company, in light of the extensive and successful services rendered by plaintiffs' counsel in prosecuting and resolving the Action, also fully justify this Court's approval of the Fee Award.

[6]    All paragraph citations referenced herein are to plaintiffs' Consolidated Amended Verified Shareholder Derivative Complaint field on September 26, 2005 (the "Complaint").

[7]    The "Relevant Period" is defined as November 3, 2003 through February 10, 2005, inclusive. *See* Harwood Dec. at ¶ 6.

On February 11, 2005, Veeco announced that it was postponing the release of its financial results for the fourth quarter and full year 2004 pending completion of an internal investigation of improper accounting transactions at TurboDisc. *Id.* at ¶ 7. Veeco revealed that "[t]he investigation focuses principally on the value of inventory, accounts payable and certain revenue items carried on the books of TurboDisc." *Id.* The price of Veeco common stock fell by approximately 10% on this news. *Id.* at ¶ 8.

On March 8, 2005, Veeco announced that numerous securities fraud class action lawsuits had been filed against the Company, its officers, and its directors in connection with the February 11, 2005 announcement regarding the internal investigation of accounting improprieties at the TurboDisc division. *Id.* at ¶ 9. A little over a week later, on March 16, 2005, Veeco filed its annual report with the SEC on Form 10-K. *Id.* at ¶ 10. Therein, Veeco revealed that it lacked the proper controls and oversight to adequately and responsibly report its financial results. *Id.*

As a result of the inadequate controls and oversight at TurboDisc, Veeco was ultimately forced to restate its financial results for the first three quarters of fiscal 2004. *Id.* at ¶ 11. This restatement included a reduction of the Company's pre-tax earnings of $10.2 million, comprised of $8.1 million in adjustments relating to inventory, accounts and accounts payable, and $2.1 million in adjustments relating to revenue recognition issues. *Id.*

The Action was initiated on March 15, 2005 by the filing of a shareholder derivative complaint in the United States District Court for the Eastern District of New York (the "Eastern District"), captioned *Huneke v. Braun*, No. 7:05-CV-10224-CM (originally No. 1:05-CV-01384-LDW-ETB). *Id.* at ¶ 18. Two substantially similar shareholder derivative complaints were filed thereafter in the Eastern District: *Schupp v. Braun*, No. 7:05-CV-10225-CM (originally No. 1:05-CV-01624-LDW-ETB) and *Altman v. Braun*, No. 7:05-CV-10226-CM (originally No. 1:05-CV-01986-LDW-ETB). *Id.* After the initial complaints were filed, plaintiffs continued their comprehensive investigation of Veeco and defendants. This undertaking included a review of the Company's financial filings, press releases, and analyst reports, and an effort to identify

witnesses that likely possessed information related to the claims at issue in the Action. *Id.* at
¶19.

After plaintiffs' preliminary investigation was completed, the *Huneke, Schupp,* and
*Altman* cases were ultimately consolidated as the Action (No. 1:05-CV-01384-LDW-ETB) in the
Eastern District on July 29, 2005. *Id.* at ¶ 18. On September 26, 2005, plaintiffs filed the
Complaint on behalf of nominal party Veeco against defendants.[8] *Id.* at 20. The Complaint
alleged: (i) that defendants breached their fiduciary duties of loyalty and good faith by (a) failing
to remedy or disclose Veeco's deficient internal accounting controls, (b) failing to prevent Veeco
from issuing false and misleading information to its stockholders and the investing public
regarding Veeco's financial results and internal accounting controls, and (c) failing to remedy or
prevent ongoing violations of the federal export laws; (ii) that defendants wasted Veeco's
corporate assets; and (iii) that defendants were unjustly enriched. *See* Stipulation at 3.

In the Complaint, plaintiffs also alleged that defendants' breaches of fiduciary duty
exposed Veeco to damages in a securities class action captioned *In re Veeco Instruments, Inc.
Sec. Litig.,* No. 7:05-MD-01695-CM-GAY (the "Securities Action") pending in this Court, and
additionally caused Veeco to incur the costs of (i) defending and settling the Securities Action;
(ii) restating its financial results for the first three quarters of 2004; and (iii) carrying out internal
investigations concerning the restatement and related accounting and internal controls issues. *Id.*
On November 30, 2005, the Multi-District Litigation Panel transferred the Action from the
Eastern District to this Court for "coordinated or consolidated pretrial proceedings" with the
Securities Action. *See* Harwood Dec. at ¶ 21.

On April 24, 2006, defendants moved to dismiss the Action. *Id.* at ¶ 22. Defendants
argued that the Complaint should be dismissed because plaintiffs (i) failed to state a claim upon

---

[8]    "Defendants" include Edward H. Braun, Peter J. Simone, Richard A. D'Amore, Joel A.
Elftmann, Heinz K. Fridrich, Douglas A. Kingsley, Paul R. Low, Roger D. McDaniel, Irwin H.
Pfister, and Walter J. Scherr. *See* Harwood Dec. at ¶ 3 n.1.

which relief could be granted; (ii) failed to make demand on the Board prior to commencing the Action as required by Delaware law; and (iii) failed to demonstrate that such a demand was futile. *Id.*

Plaintiffs carefully analyzed defendants' arguments, conducted necessary legal research, and filed their opposition to defendants' motion to dismiss on May 3, 2006. *Id.* at ¶ 23. Specifically, plaintiffs argued they had adequately alleged claims for breach of fiduciary duty, and more importantly, that they had adequately alleged demand futility. *Id.* On June 14, 2006, this Court denied defendants' motion to dismiss. *Id.* at ¶ 24.

After this Court denied defendants' motion to dismiss, plaintiffs aggressively pursued discovery. *Id.* at ¶ 26. On July 27, 2006, plaintiffs entered into a stipulation with defendants and the plaintiffs in the Securities Action to coordinate discovery. *Id.* Thereafter, in response to plaintiffs' document requests, defendants produced and plaintiffs analyzed over 175,000 pages of documents. *Id.* Plaintiffs also served certain requests pursuant to the Freedom of Information Act ("FOIA") and obtained and inspected additional documents related to their allegations of export law violations at Veeco. *Id.* at ¶ 27.

Over the next several months, plaintiffs prepared for and took depositions. *Id.* at ¶ 28. In all, plaintiffs took eight depositions and participated in six additional depositions taken by plaintiffs' counsel in the Securities Action. *Id.* These depositions included directors and officers of Veeco as well as third parties, including Veeco's auditors and the firm hired to perform forensic and reconstructive accounting regarding Veeco's integration of TurboDisc. *Id.* During this same time frame, plaintiffs began to contact potential experts, and they eventually retained both an accounting and a "corporate governance" expert.

On several occasions after discovery commenced, the parties discussed the possibility of settlement. *Id.* at ¶ 29. These initial discussions showed promise, and as a result, the parties retained a highly-experienced mediator, the Honorable (Ret.) Nicholas Politan to assist their efforts. *Id.* Plaintiffs and defendants scheduled a mediation session which took place on October 11, 2006. *Id.* However, the parties did not reach a settlement agreement as a result of

the mediation, and thereafter plaintiffs continued to aggressively pursue the litigation. *Id.* at ¶ 31.

On November 7, 2006, after the settlement discussions and mediation had failed, plaintiffs moved for leave to file a Second Consolidated Amended Verified Shareholder Derivative Complaint to include allegations and claims relating to stock option backdating at Veeco.[9] *Id.* at ¶ 32. Defendants opposed this motion, resulting in substantial briefing by the parties. *Id.* On February 23, 2007, this Court denied plaintiffs' motion for leave to file a Second Consolidated Amended Verified Shareholder Derivative Complaint. *See* Stipulation at 4.

Thereafter, plaintiffs began trial preparation. Harwood Dec. at ¶ 33. The parties exchanged expert reports and scheduled expert depositions. *Id.* Plaintiffs submitted two expert reports: one by a damages expert, and another by a corporate governance expert who opined on the underlying conduct. *Id.* Meanwhile, defendants submitted three expert reports, one by a damages expert and two by corporate governance experts, which concluded that there were no damages and no liability for the underlying conduct. *Id.* Plaintiffs also undertook the substantial task of preparing a final pre-trial order, which necessarily required a re-review and analysis of the underlying documents and a thorough review of the deposition transcripts to designate trial exhibits and testimony. *Id.* at ¶ 34.

However, with a trial only a matter of weeks away, the parties to the Action renewed their settlement discussions. *Id.* at ¶ 35. By early November 2007, as the parties were preparing a final pre-trial order, after vigorous, good faith, arm's-length negotiations, the parties reached an

---

[9] In addition to the new allegations and claims relating to stock option backdating at Veeco, plaintiffs sought to add the following individuals as defendants to the Action: John F. Rein, Jr., Francis Steenbeke, John P. Kiernan, Don R. Kania, Anthony L. Martinez, Emmanuel N. Lakios, and Timothy J. Stultz. *See* Stipulation at 4.

agreement in principle on the terms of a Settlement[10] as reflected in a Memorandum of Understanding (the "MOU"). *Id.* The MOU was executed on November 5, 2007. *Id.*

As discussed in detail herein, plaintiffs submit that the proposed Settlement represents a "fair and adequate" result for Veeco and current Veeco stockholders and therefore should be approved.

## III.    TERMS AND BENEFITS OF THE SETTLEMENT

In connection with the filing, prosecution, and settlement of the Action, the Board has agreed to adopt substantial corporate governance changes that will confer significant benefits on Veeco and current Veeco stockholders. The Settlement provides Veeco with invaluable corporate governance reforms, as memorialized in the Stipulation. These reforms address critical areas where Veeco's governance was previously lacking, including: (a) Board independence and Board-level governance, (b) management-level governance, and (c) an expansive adoption of certain "best practices" that inure to the benefit of Veeco and current Veeco stockholders. These valuable corporate governance changes include:[11]

A.    independent directors must now comprise two-thirds of the membership of the Board;

---

[10]    Although this Court had previously denied plaintiffs' motion for leave to file a Second Consolidated Amended Verified Shareholder Derivative Complaint, the parties agreed as part of the Settlement that the "Released Claims" included those relating to the allegations set forth in the proposed Second Consolidated Amended Verified Shareholder Derivative Complaint, including but not limited to, any claims related to the granting, dating, or modification of stock options by the Company to its officers and directors. *See* Stipulation at 8-9.

[11]    The following discussion of the corporate governance policies which the Board has agreed to adopt is not meant to be exhaustive, but rather to recount the most significant provisions. The comprehensive set of corporate governance principles which the Board has agreed to adopt in connection with the filing, prosecution, and settlement of the Action is attached to the Stipulation as Exhibit A.

       B.      the Board has designated a "Lead Independent Director" to assist both the Chairman of the Board and the coordination of activities of the Board's other independent directors;

       C.      a material enhancement of the Company's internal audit function;

       D.      the Board will create the position of, and designate, a Chief Compliance Officer; and

       E.      Veeco has agreed to follow "best practices" in connection with the Company's stock option awards.

*See* Harwood Dec. at ¶ 36.  In sum, the corporate governance enhancements the Board has agreed to adopt will help ensure that the Board and management will remain more active and better engaged in all aspects of Veeco's business conduct and compliance.

The Stipulation provides that plaintiffs' counsel's prosecution of the Action was a material factor in the Board's decision to adopt the corporate governance provisions set forth therein, and summarized above.  These corporate governance enhancements have benefited Veeco and its shareholders and will continue to benefit Veeco and current Veeco stockholders.  Based on these considerations, among others, plaintiffs' counsel believe that the Settlement confers substantial benefits upon plaintiffs, Veeco, and current Veeco stockholders.  *See* Harwood Dec. ¶ 38.

## IV.    THE STANDARDS FOR JUDICIAL APPROVAL OF DERIVATIVE SETTLEMENTS

### A.    <u>The Role Of The Court In Approval Of A Settlement</u>

Federal Rule of Civil Procedure 23.1 requires court approval of a shareholder derivative action settlement or dismissal.  The court's function in reviewing a proposed settlement is to evaluate the facts and circumstances that bear on the reasonableness of the proposed settlement.

*Prezant v. DeAngelis*, 636 A.2d 915, 921-22 (Del. 1994)[12]; *City of Detroit v. Grinnell Corp.*, 356 F. Supp. 1380, 1385 (S.D.N.Y. 1972), *aff'd in part & rev'd in part on other grounds*, 495 F.2d 448 (2d Cir. 1974). In evaluating a settlement, the court need not try the issues or decide the merits of the case. *Prezant,* 636 A.2d at 921. *Accord Krinsky v. Helfand*, 156 A.2d 90, 94 (Del. 1959) (noting that the court is not to "try the issues of the case" because "any such requirement would defeat the purpose of the settlement, itself"). Rather, as set forth more fully below, the Court must consider the nature of the claims, the possible defenses to the claims, the legal and factual obstacles to be faced by the plaintiffs at trial, and the delay, expense, and complexity of continuing with the Actions. *Kahn v. Sullivan*, 594 A.2d 48, 59 (Del. 1991). In this context, the U.S. Court of Appeals for the Ninth Circuit has stated:

> The district court's ultimate determination will necessarily involve a balancing of several factors which may include, among others, some or all of the following: the strength of plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

*Officers for Justice v. Civil Service Commc'ns,* 688 F.2d 615, 625 (9th Cir. 1982).[13] Because a settlement represents an exercise of judgment by the negotiating parties, the function of a judge reviewing a settlement is neither to rewrite the settlement agreement reached by the parties nor to try the case by resolving issues intentionally left unresolved. *Officers for Justice*, 688 F.2d at 625. Where, as here, the parties have thoroughly investigated the factual background of the case, vigorously advanced their respective views of the strengths and weaknesses of the case,

---

[12]    Veeco is a Delaware corporation, and thus its law applies to all substantive aspects of the Actions, including the standard for settlement review. *Kamen v. Kemper Fin. Serv. , Inc.*, 500 U.S. 90 (1991).

[13]    The factors used in class action settlements are universally applied in shareholder derivative settlements. *See, e.g., In re Metropolitan Life Deriv. Litig.,* 935 F. Supp. 286, 291 (S.D.N.Y. 1996).

negotiated at arm's-length and in good faith to arrive at a settlement whereby plaintiffs have obtained valuable benefits for Veeco and current Veeco stockholders, the Settlement should be approved. *See Barkan v. Amsted Indus., Inc.*, 567 A.2d 1279, 1281 (Del. 1989); *Sugarland Indus., Inc. v. Thomas*, 420 A.2d 142, 147 (Del. 1980).

It is well-settled that compromises of disputed claims are favored by the courts. *Williams v. First Nat'l Bank*, 216 U.S. 582, 595 (1910). Indeed, the Second Circuit has noted that "courts are bound to encourage "the settlement of litigation." *Gambale v. Deutsche Bank AG,* 377 F.3d 133, 143 (2d Cir. 2004). This principle is particularly true in the context of complex shareholder litigation, because settlements promote judicial economy and serve the public interest. *See, e.g.*, *In re Vitalink Commc'n Corp. S'holders Litig.*, Civ. A. No. 12085, 1991 WL 238816, at *4 (Del. Ch. Nov. 8, 1991).

The court's role in deciding whether to approve a settlement of representative litigation is focused upon consideration of the overall fairness, reasonableness, and adequacy of the settlement, and not upon determining the result which might have been obtained after trial. *See Grinnell,* 356 F. Supp. at 1385. Thus, the "'evaluation of a proposed settlement requires an amalgam of delicate balancing, gross approximations and rough justice. . . .'" *Bonime v. Doyle*, 416 F. Supp. 1372, 1387 (S.D.N.Y. 1976), *aff'd*, 556 F.2d 554 (2d Cir. 1977), *cert. denied sub nom.*, *Sloan v. Bonime*, 434 U.S. 924 (1977) (quoting *Grinnell*, 495 F.2d at 468).

**B.    The Settlement Is Fair, Reasonable And Adequate**

As discussed in detail herein, the Settlement is fair, reasonable, and adequate and therefore should be approved. This is particular true in light of the substantial challenges plaintiffs would have faced going forward with the prosecution of the Action. Harwood Dec. ¶¶ 39-45. In the context of the alleged wrongdoing, the Settlement provides lasting benefits through the long-term remedial and therapeutic aspects of the Settlement, which are specifically designed

to protect and preserve Veeco for the benefit of the Company and its shareholders. *See generally In re Caremark Int'l, Inc. Deriv. Litig.*, 698 A.2d 959, 966 (Del. Ch. 1996). Indeed, the establishment of previously non-required corporate governance procedures or mechanisms (as the Settlement will accomplish) provides significant benefits to the nominal defendant in a shareholder derivative action. *Citron v. Burns*, No. 7647, 1985 WL 11533, at *2 (Del. Ch. Feb. 4, 1985). For this reason, courts have regularly approved settlements such as this one, which are comprised entirely of non-monetary corporate governance enhancements tailored to the improprieties alleged. *See, e.g., In re Texaco, Inc. S'holder Litig.*, 20 F. Supp. 2d 577, 584-85 (S.D.N.Y. 1998), *rev'd on other grounds sub nom., Kaplan v. Rand*, 192 F.3d 60 (2d Cir. 1999).

The Settlement here provides significant therapeutic benefits of corporate governance enhancements, which are designed to minimize the probability of future breaches of fiduciary duties and damages to the Company. *See, e.g., Cohn v. Nelson*, 375 F. Supp. 2d 844, 854-55 (E.D. Mo. 2005) (applying Delaware law) (noting that as a result of corporate governance relief obtained in settlement, corporation would be less likely to become subject to lengthy and costly litigation in the future). Veeco's conformance to the law, regulations, and high standards of business ethics required by the prophylactic measures of the Settlement is fully expected to preclude a repetition of the consequences of the wrongdoing alleged in the Action. Harwood Dec. ¶ 38. Consequently, the Settlement is clearly fair, reasonable, and adequate and should be approved.

### C. Factors Supporting Approval Of The Settlement

In reviewing a proposed settlement of shareholder derivative litigation, Delaware courts (like courts in virtually every jurisdiction) make a determination as to whether the overall settlement is fair, reasonable and adequate. *See, e.g., Polk v. Good,* 507 A.2d 531, 536 (Del. 1986). Although courts do not employ a "bright-line" test in determining fairness,

reasonableness and adequacy, courts typically consider such factors as: (1) risks of establishing liability; (2) risks of establishing damages; (3) complexity, expense, risk, and duration of further litigation; (4) reaction of the affected shareholders to the proposed settlement; (5) amount of discovery completed; and (6) views of experienced counsel. *Id.*

Here, application of the foregoing factors strongly supports approval of the Settlement. Indeed, the Settlement, which materially enhances Veeco's corporate governance practices, easily "fairly" resolves plaintiffs' claims. In light of the substantial challenges that continued litigation of the Action would present, plaintiffs respectfully submit that the Settlement warrants this Court's final approval.

### 1. Risks of Establishing Liability

In evaluating the settlement of a shareholder action, courts have long recognized that such litigation "is notably difficult and notoriously uncertain," *Lewis v. Newman*, 59 F.R.D. 525, 528 (S.D.N.Y. 1973), and that compromise is particularly appropriate. *Nelson v. Bennett*, 662 F. Supp. 1324, 1334 (E.D. Cal. 1987). While plaintiffs believe their claims have merit, they also believed that ultimately establishing defendants' liability would have been difficult. Harwood Dec. ¶¶ 42, 43.

### a. Plaintiffs' Proposed Claims Based on Stock Option Backdating

First, with respect to plaintiffs' proposed allegations and claims arising from stock option backdating, plaintiffs *did not* make a demand on the Board. Thus, absent Settlement, there is, at the least, an open question as to whether plaintiffs would have standing to bring any such claims on the Company's behalf. In order to pursue any claims based on alleged stock option backdating, plaintiffs would first have had to establish that demand on the Board was excused as a matter of law. *See*, *e.g., Aronson v. Lewis*, 473 A.2d 805 (Del. 1984). Establishing demand futility is always an uncertain proposition. *See, e.g., Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1048-52 (Del. 2004); *Levine v. Smith*, 591 A.2d 194, 197-208 (Del. 1991). Indeed, as plaintiffs' counsel can attest through their own substantial

13

personal experience in this area of the law, the pre-suit demand requirement is no empty procedural test.[14]

This has proven true in the "options backdating" context as well. As discussed previously, over the past two years, there have been numerous corporations that have come under scrutiny based on their historical option granting practices, and this has in turn produced a flurry of derivative lawsuits. Nearly every one of these actions has been dismissed on demand futility grounds,[15] including cases where the subject corporation has admitted that it awarded backdated options.[16] Of course, here, defendants have denied and continue to deny that intentionally "backdated" options were awarded at Veeco. Thus, although plaintiffs believe that they could have raised strong demand futility allegations in this regard, plaintiffs' counsel are also aware that similar allegations in other shareholder derivative actions have failed. *See, e.g., Risberg,* 531 F. Supp. 2d 213. It was clear that, at the least, plaintiffs faced a challenge in adequately alleging, and then proving, demand futility. Thus, plaintiffs believed that there was a possibility that their proposed claims regarding stock option backdating might never have progressed

---

[14]    The demand requirement, though sounding "procedural" in nature, is, in fact, a "substantive" issue of law. *See Kamen*, 500 U.S. at 96; *Aronson*, 473 A.2d at 809.

[15]    *See, e.g., In re Linear Tech. Corp. Deriv. Litig.,* 2006 WL 3533024 (N.D. Cal. Dec. 7, 2006); *In re Openwave Sys. Inc. S'holder Deriv. Litig.,* 2007 WL 1456039 (N.D. Cal. May 17, 2007); *In re Computer Sciences Corp. Deriv. Litig.,* 2007 WL 1321715 (C.D. Cal. Mar. 26, 2007); *In re F5 Networks, Inc.,* 2007 WL 2476278 (W.D. Wash. Aug. 6, 2007); *In re PMC-Sierra, Inc. Deriv. Litig.,* 2007 WL 2427980 (N.D. Cal. Aug. 22, 2007); *In re CNET Networks, Inc. S'holder Deriv. Litig.,* 483 F. Supp. 2d 947 (N.D. Cal. 2007); *In re Infosonics Corp. Deriv. Litig.,* 2007 WL 2572216 (S.D. Cal. Sept. 4, 2007); *In re Verisign, Inc. Deriv. Litig.,* 531 F. Supp. 2d 1173 (N.D. Cal. 2007); *Risberg v. McArdle,* 529 F. Supp. 2d 213 (D. Mass. 2008); *In re Finisar Corp. Deriv. Litig.,* 2008 WL 131867 (N.D. Cal. Jan. 11, 2008); *In re MIPS Tech., Inc. Deriv. Litig.,* 2008 WL 131915 (N.D. Cal. Jan. 11, 2008); *Desimone v. Barrows,* 924 A.2d 908 (Del. Ch. 2007); *In re Comverse Tech., Inc. Deriv. Litig.,* No. 601272/06, Slip op. (N.Y. Sup. Ct. Aug. 14, 2007); *Wandel v. Eisenberg,* No. 603665/06, Slip op. (N.Y. Sup. Ct. May 2, 2007). All unreported cases are contained in a compendium filed concurrently herewith.

[16]    *See, e.g., CNET,* 483 F. Supp. 2d at 947; *Comverse,* No. 601272/06, Slip op. at 3.

beyond the pleading stage, and that the merits of those claims might never have been presented to any court.

b.    Plaintiffs' Upheld Claims in the Action

With respect to plaintiffs' claims in the Action which survived defendants' motion to dismiss, defendants possess a number of strong arguments that could have precluded a finding of liability. Most significantly, plaintiffs would have had to overcome the protections afforded the Board under the so-called "business judgment rule." *See Aronson, supra.* Undoubtedly, defendants would have tried to rely on the protections by the rule with respect to many of the acts challenged by plaintiffs. *Id.* at 811. Although referred to as a "rule," the idea of "business judgment protection" for directors is more akin to a broad doctrine or concept, and it is, perhaps, the fundamental precept of Delaware corporate law. *See generally In re Walt Disney Co. Deriv. Litig.,* 907 A.2d 693 (Del. Ch. 2005), *aff'd,* 906 A.2d 27 (Del. 2006). While the business judgment rule (and the protections it affords Delaware directors) has been articulated in slightly varied ways (and has taken varied forms), it essentially stands for the proposition that there is strong presumption that, in making a disinterested business decision, the directors of a Delaware corporation acted on an informed basis, in good faith, and with the honest belief that the action taken was in the best interests of the corporation. *Disney,* 907 A.2d at 746-47.[17]

Here, the application of the business judgment rule could have substantially impaired plaintiffs' claims. For example, the claims in the Complaint against defendants were based on plaintiffs' allegations that the Company's directors breached their fiduciary duties of loyalty and good faith by failing to ensure that Veeco was accurately reporting TurboDisc's financial results.

---

[17]    *See also Aronson,* 473 A.2d at 812. Countless courts and too many commentators to list have discussed the concept of the business judgment rule and its implications, particularly in the wake of the well-publicized *Disney* decision. A discussion of all of the iterations of the rule is not appropriate in this context, but plaintiffs respectfully refer the Court to Chancellor Chandler's *Disney* decision (where judgment was entered for defendants on all claims after a 10-week bench trial) for an extensive explanation of the rule's development and teachings.

Harwood Dec. at ¶ 13. Defendants' alleged breaches included a failure to implement an adequate system of corporate checks and balances in order to safeguard the TurboDisc division from financial fraud. *Id.* Plaintiffs alleged that defendants did not react timely to these shortcomings, including permitting complete control over the TurboDisc accounting system to rest in the hands of only one employee. *Id.* In light of the business judgment rule, however, in order to prove these claims at trial, plaintiffs would have had to overcome the powerful presumption that the directors on the Board acted appropriately when they were put on notice regarding TurboDisc's problems. This would have been a difficult task, even assuming, *arguendo*, that defendants' decisions later proved to be "incorrect."

Arguably, at least with respect to most of the claims which this Court upheld following defendants' motion to dismiss, plaintiffs would have had to prove that the Board's actions (or inactions) were the product of "bad faith," a very high proof of standard under virtually any circumstances. *See generally White v. Panic*, 783 A.2d 543 (Del. 2001); *see also In re J.P. Stevens & Co. S'holders Litig.*, 542 A.2d 770, 780-81 (Del. Ch. 1988) (identifying bad faith by "assessing whether that decision is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith"). Thus, for example, plaintiffs would have had to demonstrate that the Board was actually aware of internal control problems at TurboDisc, and that its directors failed to address them in any manner, or that they addressed them in an irrational manner. Although plaintiffs believe that internal control deficiencies at TurboDisc were known at Veeco, and even though plaintiffs conducted substantial discovery in connection with their prosecution of the Action, it is unclear as to when those issues became known to the Board and to what extent its directors attempted to design and implement controls that would address TurboDisc's issues. Plaintiffs believe that this claim against the nominally-independent directors on the Board (who were not responsible for the day-to-day operations of the Company) would have been particularly difficult to prove. Although plaintiffs do not concede that their claims would have been necessarily tested by Delaware's bad faith standard, they acknowledge that, had the Court employed this standard of review, they

would have faced the very real possibility that some or all of these claims would have been lost at trial (if not earlier at summary judgment).

In short, although plaintiffs believed in their arguments against the protections afforded by the rule with respect to many of the acts challenged in the Action, the prospect that defendants could have been shielded by this protective umbrella made establishing liability in the Action uncertain. All of the reasons set forth above lend support to the proposition that a positive resolution of the Action was uncertain. That plaintiffs were able to achieve a Settlement in the face of these obstacles is a testament to the Settlement's fairness and reasonableness, and thus strongly suggests that the Settlement should be approved.

### 2. Risks in Establishing Damages

Even if plaintiffs were successful in establishing liability, to establish damages at trial, they would have had to prove, *inter alia*, that the claims in the Action actually caused Veeco to suffer non-exculpated damages and that defendants, as a matter of law, could be held liable for those damages. Under traditional applications of Delaware law, plaintiffs faced a formidable challenge establishing and collecting monetary damages in the Action.

Undoubtedly, defendants would have argued that, at most, plaintiffs alleged "due care" oversight claims. Because Veeco's Articles of Incorporation contain an exculpatory clause for such claims, permissible under 8 Del. C. § 102(b)(7), plaintiffs may have ultimately proved their claims, only to see defendants exculpated. *See*, *e.g.*, *Prod. Res. Group, L.L.C. v. NCT Group, Inc.*, 863 A.2d 772, 799 (Del. Ch. 2004). Plaintiffs believe they could have asserted strong arguments against the application of a due care analysis to their claims, but the possibility that some or all of their claims could have been characterized as due care claims could have meant that the claims were subject to dismissal.

Beyond the hurdle of establishing defendants' liability for their alleged wrongdoing, plaintiffs faced considerable uncertainty with respect to establishing damages to Veeco. Upon plaintiffs' establishing liability, the issue of damages to Veeco would have been hotly disputed

and clearly would have been the subject of expert testimony proffered by all parties.[18]   The

damage assessment of experts retained by the parties varied substantially, and the assessment of

this crucial element of plaintiffs' claims would have been reduced at trial to a "battle of the

experts." Indeed, throughout the Action, defendants continuously maintained that Veeco had not

suffered any damages as result of the conduct alleged in the Complaint, a view which was

strongly supported by defendants' expert reports.  It is far from certain that a jury would have

disregarded defendants' experts' opinions.  Indeed, a jury might be swayed by defense experts

seeking to establish that damages were caused by factors other than defendants' wrongdoing, or,

alternatively, trying to minimize the amount of the Company's damages.  *See, e.g., In re*

*PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 128-29 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721

(2d Cir. 1997).  Conceivably, a jury could find that there were no damages or that the damages

were a mere fraction of the amount that plaintiffs contended.

By contrast, the settlement terms provide the certainty of known, material benefits to the

Company.  As the U.S. Court of Appeals for the Fifth Circuit cogently observed:

> [W]here, as here, the derivative suit is largely an attack on past corporate
> management practices, as well as on some present officers and directors, the
> dollar amount of a possible judgment, which is essentially the sole goal in the
> class action damage suit, is not the sole, and may well not be the most important,
> matter to be considered, for the effects of the suit on the functioning of the
> corporation may have a substantially greater economic impact on it, both long-
> and short-term, than the dollar amount of any likely judgment in its favor in the
> particular action.

---

[18]      *See In re Lloyd's Am. Trust Fund Litig.*, No. 96 Civ. 1262 (RWS), 2002 WL 31663577,
at *21 (S.D.N.Y. Nov. 26, 2002) ("The determination of damages ... is a complicated and
uncertain process, typically involving conflicting expert opinions.  The reaction of a jury to such
complex expert testimony is highly unpredictable.").

*Maher v. Zapata Corp.,* 714 F.2d 436, 461 (5th Cir. 1983).[19]  "The evaluation of such an economic impact is necessarily judgmental and imprecise and normally does not lend itself to meaningful quantification." *Id.*

Thus, while it is clear to plaintiffs that Veeco suffered *losses* as a result of the conduct challenged in the Action, the question of whether it suffered legal, non-exculpated *damages* is a much more complicated question. Thus, complex damages issues versus the known benefits of settlement clearly weigh in favor of its approval.

### 3.    Complexity, Expense, Risk, and Duration of Further Litigation

In addition to the substantial risks associated with enforcing the Company's rights through the courts, there were numerous risks posed by the complexity and likely expense of the further prosecution of the Action.  The Action involved complex claims concerning hundreds of thousands of pages of documents and, at least with respect to damages analysis, myriads of regulations and calculations.

Plaintiffs anticipated that a trial of the Action would have taken, at minimum, several weeks.  The expense of such a trial and the use of both judicial resources and the resources of the parties would have been substantial.  Furthermore, submitting a matter to a jury is always an uncertain proposition at best.  *See Weiss v. Mercedes-Benz of N.A., Inc.*, 899 F. Supp. 1297, 1300-1301 (D.N.J. 1995), *aff'd*, 66 F.3d 314 (3d Cir. 1995) ("[W]hen parties negotiate a settlement, they have far greater control of their destiny than when a matter is submitted to a jury.  Moreover, the time and expense that precedes the taking of such a risk can be staggering. This is especially true in complex commercial litigation.").  The considerable expense of further litigation, with the concurrent risk of no recovery in the Action, injunctive or monetary, provides further support for the Settlement.

---

[19]    Indeed, in light of the significant benefits of the Settlement, one could argue that the governance relief obtained is and will be more valuable to the Company and its stockholders over the long term than any modest monetary judgment plaintiffs may have obtained at trial.

Moreover, in light of the nature of the Action, it is likely that any judgment in favor of plaintiffs would have been the subject of extensive post-trial motions and appeals, further prolonging the Actions, and adding a considerable risk factor. Thus, the Settlement, providing immediate benefits, was advantageous to the Company. *See*, *e.g.*, *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 748 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986) ("[a]n appeal could seriously and adversely affect the scope of an ultimate recovery, if not the recovery itself").[20]

Plaintiffs weighed each of these risks against the immediate benefits the Settlement will provide to the Company and current Veeco stockholders. These risks presented the possibility not only that the prosecution of the Action could be unsuccessful, but that prosecution of the Action through trial, post-trial motions, and appeals could be potentially detrimental to the Company. In light of the complexity, length, and uncertainty of the continued prosecution of the Action, and the benefits achieved by the Settlement, the conclusion is inescapable – the Settlement is fair and reasonable and should be finally approved.

### 4.    The Reaction of Current Veeco Stockholders also Supports a Finding that the Settlement Should Be Approved

As discussed above, pursuant to the Court's Preliminary Order, on January 31, 2008: (i) the Notice of the Settlement and Fee Award was published by Veeco as a current report on SEC Form 8-K; and (ii) Veeco provided a link on its corporate website to the Notice. Here, the

---

[20]    *See Packard v. Provident Nat'l Bank*, 994 F.2d 1039 (3d Cir. 1993) (reversing judgment requiring bank to reimburse class members in excess of $60 million and dismissing case); *Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990) (class won a jury verdict and a motion for judgment N.O.V. was denied, but on appeal the judgment was reversed and the case dismissed); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979) (reversal of multimillion dollar judgment obtained after protracted trial); *Trans World Airlines, Inc. v. Hughes*, 312 F. Supp. 478, 485 (S.D.N.Y. 1970), *modified*, 449 F.2d 51 (2d Cir. 1971), *rev'd*, 409 U.S. 363, 366 (1973) ($145 million judgment overturned after years of litigation and appeals).

Notice period was forty-seven (47) days, a period long enough to easily satisfy federal notions of due process.[21]

Pursuant to the Preliminary Order, any objections to the Settlement had to be lodged with the Court and served on the parties no later than March 18, 2008. Here, and despite the fact that Veeco has nearly 32 million shares outstanding held by thousands of stockholders,[22] plaintiffs are not aware of a single objection to the Settlement (or for that matter, the Fee Award). "[T]he reaction of the class to the proffered settlement is perhaps the most significant factor to be weighed in considering its adequacy . . . ." *In re SmithKline Beckman Corp. Sec. Litig.*, 751 F. Supp. 525, 530 (E.D. Pa. 1990). A small number of objections is convincing evidence of a proposed settlement's fairness and adequacy. *See, e.g.*, *Rome v. Archer*, 197 A.2d 49, 58 (Del. 1964) (approving settlement agreement which was ratified by a very large majority of the stockholders); *Chiulli v. Hardwicke Cos.*, 1985 WL 11532, at *1 (Del. Ch. Feb. 11, 1985) (in the absence of objection, approval of settlement "would be almost perfunctory"); *Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118-19 (3d Cir. 1990) ("only" 29 objections out of a 281 member class "strongly favors settlement").

Current Veeco stockholders' lack of opposition to the Settlement also strongly supports the conclusion that the Settlement is fair to Veeco and should be approved by this Court.

**5.    Opinion of Plaintiffs' Counsel**

In appraising the fairness of the Settlement, the opinion and recommendation of experienced counsel favoring the settlement is entitled to considerable weight. As one court stated: "The recommendations of plaintiffs' counsel should be given a presumption of

---

[21]    *See Miller v. Republic Nat'l Life Ins. Co.*, 559 F.2d 426, 429-30 (5th Cir. 1977) (four weeks between notice and settlement hearing was sufficient); *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 121 (8th Cir. 1975) (19-day notice period sufficient); *Greenspun v. Bogan*, 492 F.2d 375, 378 (1st Cir. 1974) (24-day notice period sufficient).

[22]    *See* the Yahoo! finance page for Veeco at http://finance.yahoo.com/q/ks?s=VECO. Over 89% of the Company's float is held by institutional investors.

reasonableness. Attorneys, having intimate familiarity with a lawsuit after spending years in litigation, are in the best position to evaluate the action, and the Court should not without good cause substitute its judgment for theirs." *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 622 (N.D. Cal. 1979) (citations omitted); *see also In re Nat'l Student Mktg. Litig.*, 68 F.R.D. 151, 155 (D.D.C. 1974) (stating that "[t]he opinion and judgment of experienced counsel, whose labors produced the settlement, should also receive due consideration"); *Schleiff v. Chesapeake & Ohio Ry. Co.*, 43 F.R.D. 175, 179 (S.D.N.Y. 1967) (noting that "recommendation of the compromise by the experienced counsel for plaintiffs is entitled to great weight").

Here, plaintiffs' counsel have litigated scores of shareholder class and derivative actions and they have well-known national reputations of pursuing their cases to a successful resolution, whether by trial or settlement. *See* Exhibits B-E. Plaintiffs' counsel have made a considered judgment based on their knowledge of the facts of the Action and their extensive experience that the Settlement is in the best interests of Veeco and current Veeco stockholders and is an excellent achievement under all the circumstances. Accordingly, the Settlement should be finally approved.

## V.    CONCLUSION

In light of all of the foregoing factors, plaintiffs' counsel respectfully submit that, in light of the benefits obtained versus the substantial obstacles plaintiffs faced going forward, the Settlement easily exceeds the fair, reasonable, and adequate standard for settlement approval. Accordingly, the Settlement should be finally approved.

Dated:  March 21, 2008

HARWOOD FEFFER LLP

By: _____

Robert I. Harwood (RH-3286)
488 Madison Avenue
New York, NY 10022
Telephone:  (212) 935-7400

GOLDMAN SCARLATO & KARON, P.C.
Paul J. Scarlato (pro hac vice) (PS-3007)
Brian D. Penny (pro hac vice) (BP-4301)
101 West Elm Street, Suite 360
Conshohocken, PA 19428
Telephone:  (484) 342-0700

FARUQI & FARUQI LLP
Nadeem Faruqi (NF-1184)
Shane Rowley  (SR-0740)
369 Lexington Avenue, 10th Floor
New York, NY 10017-6531
Telephone:  (212) 983-9330

THE WEISER LAW FIRM, P.C.
Robert B. Weiser (Of Counsel)
Brett D. Stecker (Of Counsel)
121 N. Wayne Avenue, Suite 100
Wayne, PA 19087
Telephone:  (610) 225-2677

*Attorneys for Plaintiffs*